Hillsborough, }
June 1, 1938. }

LAURA SIMONEAU & a.

*v.*

THE PRUDENTIAL INSURANCE CO.

*Emile Lemelin* and *Ernest R. D'Amours* (*Mr. D'Amours* orally), for the plaintiffs.

*Thorp & Branch* (*Mr. Branch* orally), for the defendant.

PAGE, J. The insured was employed at night in a garage at Manchester, but was permitted to sleep on the premises after midnight, unless he had calls for work. It does not appear whether his sleep was interrupted on the night of June 12. He returned home at half past seven on the morning of the 13th, attended church, went to bed at about 11, and was awakened at about 1:45 in the afternoon when two friends called to accompany him to Hampton Beach. Upon the view most favorable to the plaintiffs, the insured was not suffering from fatigue when he left home or when he entered the water after arrival at the beach.

For about a half hour after getting to the beach, Simoneau and his friends, in their bathing suits, played "catch" with a tennis ball. Then the ball was thrown out into the sea, some 200 feet. One of the insured's companions started to swim out for the ball but turned back after going part way. Simoneau, who had not before entered the water, went in and swam out to the ball.

The water was not uncommonly rough. Its temperature was 54 degrees, cold, but not findably excessively so for the time and place. Simoneau was twenty-five years old, a very strong man, in apparently good health and had never complained of illness. He was a powerful swimmer. He swam strongly to the ball, retrieved it and returned, swimming with equal strength half or two-thirds of the way to shore. Then, without any struggle that was observed, or any outcry that was heard, he disappeared in the water and was not again seen alive. About fifteen minutes after his disappearance, his body was located on the bottom of the sea and brought to shore. Attempts at resuscitation failed, and he was pronounced dead by physicians. The embalmer drew from the insured's lungs and stomach a large quantity of water.

The crucial issue presented by the examination of the witnesses and the argument to the jury in behalf of the defendant was entirely simple and depended mainly upon conflicting expert medical opinion as to the immediate cause of death. Basing its claim upon testimony of a witness it produced, which might have been rejected by the jury, the defendant argued that Simoneau ceased to swim, turned upon his back and floated quietly for about a minute. Re-

lying upon medical opinion, which the jury were also at liberty to reject, that the cause of death was heart disease, the defendant argued that "he lay over on his back, and while lying there, the burden on his heart was so great, too great for him to go on, and he simply died then and there and sank." Instead of this theory of floating, followed by death from heart disease, ending in sinking, the plaintiffs urged on the jury, from the opening of the trial, the view that the sinking happened first and was followed by drowning. The issue between these two views was clearly stated by the court to be the matter for decision both when the jury were impaneled and when the final instructions were given. The verdict established as fact the sequence urged by the plaintiffs.

The question thus presented is one of causation. The policy insured against death "as a result, directly and independently of all other causes, of bodily injuries, *effected solely through external, violent and accidental means*, of which, except in case of drowning or of internal injuries revealed by an autopsy, there is a visible contusion or wound on the exterior of the body." The rest of the accident clause is not material here. The words "accidental means" in such a contract require that the cause of the injury shall be accidental. If such a cause be lacking, recovery will be denied. *McGinley* v. *Insurance Co.*, 88 N. H. 108.

Since the decision in 1861 of *Trew* v. *Assurance Co.*, 6 Hurl. & N. 839, it appears never to have been doubted that drowning (asphyxiation in the water) is caused by external and violent means, or that it may be the result of accident. The defendant does not attempt to take a contrary position. It is bound by the authorities and the reference to drowning in its contract to the general proposition above stated. It however urges that the means of drowning in this instance were not accidental, that the voluntary action of the insured was the cause of the injury that produced death, and that volition deprived the means of accidental character. For authority the defendant relies chiefly upon *McGinley* v. *Insurance Co.*, *supra*, and the two principal cases upon which we based that decision, *United States Mutual &c. Ass'n* v. *Barry*, 131 U. S. 100 and *Landress* v. *Insurance Co.*, 291 U. S. 491.

In the *McGinley* case the insured voluntarily drank "splits," a mixture of alcohol and ginger ale, in such quantities as to cause acute alcoholism and death. We denied recovery, since the circumstances were such that no reasonable man could say that the means, the taking of alcohol into the stomach, were accidental.

In the *Barry* case the insured voluntarily jumped from a platform to the ground, a distance of four or five feet. He was strong and in good physical condition. When he alighted he was injured in such manner as to suffer a stricture of the duodenum from which he died. The jury were told in substance that the means was the jumping, but that they might inquire whether there was "anything accidental, unforeseen, involuntary, unexpected" in the act of jumping between the time the deceased left the platform and the time he alighted on the ground. The term "accidental" was defined as meaning "happening by chance; unexpectedly taking place; not according to the usual course of things; or not as expected." In other words, "if a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by accidental means."

The Supreme Court sustained the charge and the verdict for the plaintiff. "The two companions of the deceased jumped from the same platform, at the same time and place, and alighted safely. It must be presumed not only that the deceased intended to alight safely, but thought that he would. The jury were, on all the evidence, at liberty to say that it was an accident that he did not." The facts that the insured was in good health, that the height from which he jumped was only four or five feet, and that the two other men landed safely, were "all the evidence." There was no direct evidence of what accidental means intervened to cause the injury, leaving the voluntary act of jumping colorless as to cause. But the jury were permitted to infer such a means from "all the evidence."

The *Landress* case is rather peculiar to itself. It came up entirely on the pleadings. The plaintiff alleged, as the court viewed it, no more than that the insured, being in good health, went golfing under such conditions of weather as he had before met with safety, and suffered sunstroke. There was no allegation, as there was allegation and proof in the *Barry* case, that some accidental means intervened. There was, therefore, no case for the jury. The decision rests on a narrow, technical ground. For this and another reason later to be mentioned, it cannot help the defendant.

It becomes at once apparent that there are some cases where the voluntary act is proximately causal and therefore non-accidental; whereas there are other cases where the facts justify the conclusion that there has intervened between volition and injury some accidental means which deprives the voluntary act of character as proximate cause or makes it no more than the occasion for the in-

jury. · The inquiry therefore is whether some method is to be found which will determine when there is a case for the jury in spite of the voluntary act of the insured in setting in motion a train of events ending in death.

The word "accidental" in the policy is to be given the meaning that the ordinary policy holder would attach to it. *McGinley* v. *Insurance Co.*, *supra*, at page 109. The common meaning given by Webster will do as a test. "Happening by chance, or unexpectedly or not according to the usual course of things." A similar definition, it will be noted, was adopted in the *Barry* case. Applying this as a test, it is obvious that the woman who of her own volition took into her system a large quantity of "splits" did an act which in ordinary expectation or "according to the usual course of things" would cause injury. No reasonable man could infer that some accidental means intervened between her drinking and the injury; the inference was inescapable that her voluntary act was the non-accidental cause of death, even though she did not intend the result or even expect it.

In the *Barry* case the application of the same test left a question of fact for the jury as to whether there was an accidental means independent of the volition of the insured. The court thought it safe to assume that the deceased did not expect that he would be injured. It was necessary to assume that, or the result would have been expectable, leaving an inference of non-accidental means. The assumption was safely to be inferred from common knowledge of the operations of the average mind. Having made that assumption or inference, the court was ready to leave to the jury the question whether in fact there was, upon all the circumstances appearing, evidence that some unforeseen accidental means had intervened. That this latter could be inferred from ordinary experience is the striking thing about the *Barry* case, in which there was surely no evidence of the fact allowed to be inferred outside of the average experience of the three jumpers, and the average experience of men in general, as to the expectability of injury to a man in good health who jumped under the same circumstances. Whereas in the *McGinley* case reasonable men could not infer the accidental means, they could do so in the *Barry* case because it could be found that such jumping as was done did not in the "usual course of things" result in injury to a strong man in good health.

The same test has been applied in the case of policies that except from coverage injuries caused by "voluntary exposure to unnecessary danger." These present the question in essence as we now

have it. Scores of cases have been decided which arose under such clauses. The holding is almost unanimous that where the injury is the natural and expectable result of the voluntary act, and nothing unexpectable intervenes to cause the injury, the policy does not cover. But it does cover where either (1) the injury is not the natural and expectable result of the voluntary act or (2) something unforeseen occurs. 7 A. L. R. 1131, 1132.

In this jurisdiction we have held "that a voluntary exposure to unnecessary danger or obvious risk, within the meaning of the policy, is a conscious or intentional exposure to a known risk, and not a merely inadvertent or accidental one." *Whalen* v. *Insurance Co.*, 75 N. H. 297, 299. The evidence in that case was that the insured crossed tracks in a railroad yard, making use of a path frequented by many people. The day was stormy. The insured looked before crossing, but saw and heard nothing. "This evidence was surely not so conclusive that reasonable men must find that the plaintiff consciously and intentionally exposed himself to an unnecessary and obvious danger, and the court erred in withdrawing the question from the jury."

Views not distinguishable from those taken in the "voluntary exposure" cases have been taken under the "accidental means" policies. Much confusion is present, to be sure, and the decisions on similar facts reach contrary conclusions. But very high authority exists for reasoning in the same manner as in "voluntary exposure" cases. "An effect which is the natural and probable consequence of an act or course of action is not an accident, nor is it produced by accidental means . . . On the other hand, an effect which is not the natural or probable consequence of the means which produced [preceded] it, an effect which does not ordinarily follow [under the circumstances] and cannot be reasonably anticipated from the use of those means, an effect which the actor did not intend to produce and which he cannot be charged with the design of producing . . . is produced by accidental means." *Sanborn*, Circuit Judge, in *Western &c. Travelers' Ass'n* v. *Smith*, 85 Fed. 401. We have inserted in brackets words which to our mind are required to give the correct sense to language which may have been a bit broader than was intended. This case was cited with apparent approval in the *Landress* case as one of involuntary introduction of germs. The immediately accidental means (germs) entered the body through an abrasion caused by the voluntary wearing of new shoes. The reasoning of the case was that the abrasion was caused by accident and not, as

claimed by the defendant, "in the ordinary course of things." Since the abrasion was produced unexpectedly and without design, it was proper to infer that the cause of it was accidental, as in the case of slipping or piercing the foot with a shoe-nail while the shoe was being taken off.

Slipping under ordinary circumstances is regarded, by the ordinary man and courts alike, as caused by accidental means. It would take some courage for an insurer to face a judge and jury with the defence that the man who slipped was *voluntarily* walking, hence the slipping was non-accidental. That is at one extreme, just as the *McGinley* case is at the other. Between them there may be an infinite variety of cases, each presenting its own circumstances and its own issues of fact for the jury. If the result is disproportionate to the voluntary act, the jury may logically infer that something independent of the voluntary act is causal. Having an unusual result, it is scientific to search for something unusual as cause. If that something can be isolated and appears to be accidental in nature, the plaintiff's case is secure. It is insecure only when an isolation of the intervening cause proves it to be non-accidental. If it cannot be isolated successfully and remains unknown and unexplainable, it is still logical to infer that the unusual result is caused by an accidental means.

The *Barry* case, as already noted, followed this method. So did *Western &c. Association* v. *Smith, supra.* The *Landress* case (at page 496) contains these significant words: "Nor do we say that in other circumstances an unforeseen and hence accidental result may not give rise to the inference that the external means was also accidental." The two cases referred to in this connection are *Gustafson* v. *Insurance Co.*, 55 Fed. (2d), 235 and *Jensma* v. *Assurance Co.*, 64 Fed. (2d), 457.

In the *Gustafson* case the insured, while voluntarily engaged in a legal boxing match, received a blow on the chin, suffered a broken neck, and died. Recovery was permitted. The court said: "Boxing we would class with football, basket ball, baseball, horseback riding, and the like, all of which are attendant with some risks of internal injury which may result in death. Just because a man engages in any one of these exercises or sports, it cannot be said that any injuries which he received in the course of any of these games or exercises were not accidental. Death in a boxing bout, as well as in a football game, is unusual and unexpected. No man has ordinarily any cause or reasonable ground to anticipate that when he engages

in any of these games, death will result. If it does, it may truly be said to be both unexpected and not intended by any party to the game, and therefore accidental." While the District Court was talking in terms of accidental results, the Supreme Court understood that the unexpressed and correct method followed was to infer from the accidental result an accidental means, since the assumption of the voluntary act as a non-accidental cause was negatived by its ordinary inaptness to produce the death.

The *Jensma* case raised the point directly and with clarity. The insured voluntarily submitted to inoculation with a hay fever pollen extract. Somewhere in the ensuing course of events, he became infected with a germ, from the effects of which he died. Whether the infection came from the nurse's hand or some other contaminated source did not appear. In other words, the means was wholly unexplained as to character, time and circumstances. The defendant insisted that the death must be shown to be the direct result of a bodily injury through accidental means, that it was not enough "that it was accidental in the sense that it could not reasonably have been anticipated." The trial judge had been troubled by this very doubt, for evidence was entirely lacking to show just how the fatal infection occurred.

The Circuit Court of Appeals thus answered the claim of the defendant that the voluntary submission to the injection precluded recovery. "But the introduction of the death-dealing organisms into his system was an 'unforeseen or unexpected circumstance which interfered with or obstructed the usual course of' the treatment to which he had thus voluntarily submitted." The further doubts of the trial judge were thus allayed: "As we have already intimated, we need not know at what precise instant of time, by what precise instrumentality, or through what precise avenue the deadly organisms entered the insured's body; for it is in the very nature of an accident that its exact causes should not be susceptible of mathematical demonstration. All the substantial evidence requires the conclusion that death was the result of violent, external, and accidental means, and there is no substantial evidence to the contrary."

The immediate means of the death of Simoneau was his sinking below the surface of the water. If he sank by accident, the plaintiffs are entitled to recover. What produced the sinking? Reasonable men were not bound to find that the voluntary entering of the water was the cause. There are few strong swimmers who sink after voluntarily entering the water. It may then be inferred that

Simoneau sank because of an accidental cause unless (1) the entry into the water was under such circumstances that in the usual course of events the sinking was expectable, or (2) some non-accidental means appears to have intervened. As to the former, even if the defendant had clearly raised that question, it would have been for the jury. As to the latter there was no evidence of any such means except the defendant's evidence that the sinking was caused by death from heart disease. That evidence was properly submitted to the jury, and it was rejected. There was no error in the rulings of the trial judge.

*Judgment on the verdict.*

BRANCH, J., did not sit: the others concurred.