DOVER *v.* STANDARD ACCIDENT INSURANCE CO. *& a.*

*Hughes & Burns, Charles F. Hartnett, and Walter A. Calderwood, Jr. (Mr. Calderwood, Jr., orally), for the plaintiff.*

*Waldron & Boynton (Mr. Waldron orally), for the defendant.*

BURQUE, J. The Eliot Bridge is part of Dover's highways. In 1937 it was in a bad state of disrepair, and impassable. April 1, 1937, the matter was reported to the City Councils by the street superintendent. He was instructed to keep the bridge passable. A further report was made May 6, together with a plan showing the needed improvements, and the street superintendent was instructed to repair the first "bent bed." The bridge was a wooden one, decayed and continued breaking out in different places. It was necessary to inspect it regularly, this being done by an employee three times a week, and by the superintendent himself as often, and sometimes oftener. Planks kept giving way, and repairs, in addition to the reconstruction of the "bent bed" which took from May 18 to May 21, were practically continuous. Material consisting of planks and spikes were kept on the premises, and whenever a plank gave way, loosened, or broke, repairs were made. As one witness puts it, the bridge needed "constant repairing" to keep it passable. "It would be necessary to keep that bridge in a continuous state of repair," is other language used. The evidence discloses that the man in charge of the regular three-day-a-week inspections, and three other employees, made numerous repairs, not only on many work days but even Sundays. Planks kept breaking and getting loose. These repairs might take anywhere from a half hour to two hours. There is no record to show when anyone did any repairing prior to the day of the accident, after May 21. The explanation is that the repairs were so numerous and so incidental to other work that no records were kept. There is, however, a record that repairs were made the morning of the day when the accident happened (which was between 6:30 and 7:00 A.M.). The accident happened on a Wednesday, a regular inspection day. The man in charge discovered a defective plank, shortly after 8:00 A.M., his usual hour of inspection, and made the necessary repairs at once.

Defendant's position is that the policy does not cover this accident because the bridge was not at the time of the accident "actually under repair." Defendant company's position is well taken. "The question is, what would a reasonable person in the position of the insured understand the words of the policy to mean?" *McGinley*

v. *Insurance Co.*, 88 N. H. 108, 109; *Watson* v. *Insurance Co.*, 83 N. H. 200, 202. "We must assume that the words used were used advisedly and for the purpose of conveying some meaning." *McGinley* v. *Insurance Co., supra* 111. The words are to be given "the meaning that the ordinary policy holder would attach to it." *Simoneau* v. *Insurance Co.*, 89 N. H. 402, 406, and "they must be taken in their ordinary sense as commonly used and understood, and as the insured understood and could properly understand them, from the meaning which they convey to the common mind." *Stone* v. *Insurance Co.*, 69 N. H. 438, 441.

What does "actually under repairs" mean? "Actually" means, in fact, really, actively and presently. "Under" in conjunction with "actually" means "undergoing." This, it would seem, would be the meaning conveyed to the ordinary mind. It being so, a policy, such as the one in issue, would convey the natural meaning that the liability provided for, is to cover accidents occurring while repairs are actually being made. Such is not this case. No repairs were being made when the accident happened. It is conceded that if repairs had been begun the day before, and suspended at the end of working hours, to be resumed the next morning, or repairs were started in the morning and suspended at the noon hour and to be resumed in the afternoon, it could be said repairs were then in process of being made, and an accident happening during suspension of work could be covered by the policy. But such is not the case here. Repairs were made as needed, often it is true, but not daily. There is no evidence as to when repairs had been made prior to the date of the accident. Repairs made shortly after the accident, in fact the same morning, were not in the act of being made the day before, nor then begun and to be resumed the next day. The fact they were needed at the time of the accident does not help the petitioner. If never made, there would be no liability. Defendant company correctly argues that when the city employees only went there to make temporary repairs that took only an hour or two of their time, that when they left the job was completed, the repairs were at an end, and the policy from then on did not cover until such time as the employees returned to make further repairs. The conclusion is that the policy did not cover the accident to Eldridge.

The plaintiff also advances the theory that the bridge was in process of reconstruction, and that consequently the policy covers. The proposition cannot be sustained. No provision had been made

for reconstruction, and no reconstruction undertaken, except as already appears in the opinion. The bridge was not rebuilt until the year following the accident.

*Case discharged.*

All concurred.