THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, a New Jersey corporation, Appellant, v. JOSEPH F. GUTOWSKI, Appellee.

234

(*May* 3, 1955.)

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, J. J., sitting.

*John P. Sinclair* (of Berl, Potter and Anderson) for appellant.

*H. James Conaway, Jr.* (of Morris, James, Hitchens and Williams) for appellee.

Supreme Court of the State of Delaware, No. 2, 1955.

SOUTHERLAND, C. J.:

This is a suit at law upon four policies of life insurance issued by appellant upon the life of Anna S. Gutowski. The two principal issues, differing in respect of both facts and law, are as follows:

I. Are false statements by an applicant for life insurance, relating to prior hospitalization for mental illness and to treatment for chronic alcoholism, misrepresentations material to the risk?

II. Was there any evidence to support the verdict that death of the insured from an overdose of barbiturates was caused by "accidental means"?

The trial court submitted both these questions to the jury. The jury found for the plaintiff. Defendant's motion to set aside the verdict and enter judgment for the defendant was denied, and defendant appeals.

I.

The first question concerns only the fourth and last of the policies, in the sum of $500. On August 28, 1950, when the policy was issued, Anna S. Gutowski, forty-two years of age, was a married woman living with her husband. The policy was issued, without medical examination, on the basis of an application signed by Mrs. Gutowski. The application form contained the following questions:

"19. Has person proposed consulted or been treated by a doctor or other practitioner or at a dispensary or clinic within past 3 years?

"20. Has person proposed had any injury, illness or operation within past 10 years?

"21. Has person proposed ever been confined to a hospital or sanitarium for any reason?"

"22. Has person proposed ever had:

\*      \*      \*      \*      \*      \*

insanity \* \* \*."

The answer to each of these questions was "No". In fact, the applicant had a history of serious illness and hospitalization. On July 28, 1933 she was admitted to the Delaware State Hospital. Her condition was diagnosed as "psychoneurosis, anxiety type". She remained in the hospital until April 7, 1934 except for a period of two months spent at home in the late fall of 1933. She was readmitted to the same hospital on September 15, 1934 and her illness diagnosed as "alcoholic psychosis, delirium tremens". She had hallucinatory experiences during the first week in the hospital. She was discharged on July 31, 1938, having spent (allowing for times during which she was paroled) about twenty months in the hospital. She was readmitted February 21, 1946, the diagnosis being—"without psychosis acute intoxication, chronic alcoholism and a maladjusted individual." She was discharged June 29, 1948. Prior to August, 1950 she had been treated by two physicians for chronic alcoholism and delirium tremens.

Mrs. Gutowski was found dead on the morning of March 7, 1951 from an overdose of barbiturates, under circumstances hereafter more fully discussed. The company denied liability on the policy and suit was brought. At the trial the defendant proved the facts of previous illness and hospitalization above set forth. They were not disputed.

The question is whether as a matter of law these misrepresentations were material to the risk that the insurance company was asked to underwrite. We think that they were material. Mental illness and chronic alcoholism are evidence of serious impairment of health. The concealment of a serious disease or ailment has been held by our courts to be material as a matter of law. *Grand Fraternity v. Keatley*, 4 *Boyce* (27 *Del.*) 308, 88 *A.* 553 (history of treatment for diabetes) ; *Rust v. Metro-*

politan Life Insurance Co., 6 W. W. Harr. (36 Del.) 294, 175 A. 198 (history of diagnosis of duodenal ulcer). True, the latter case concerned a policy of health insurance; but it is authority for the general proposition that if the facts are undisputed, and the condition concealed is sufficiently serious, the insurer is entitled to a directed verdict. And a condition or disease is sufficiently serious to justify the court in finding it material to the risk if it would naturally have "persuasive influence upon the insurer's determination with respect to undertaking an insurance contract." *Equitable Life Assurance Society of United States v. Wilson*, 25 *Del. Ch.* 296, 18 *A.* 2d 240, 243. "A representation is material when the insured knows, or has reason to believe, that it will be likely to influence the insurance company either in fixing the amount of premium or in rejecting the risk altogether." *Johnson v. New York Life Insurance Co.*, 165 *S. C.* 494, 164 S. E. 175, 177.

Of course, there are many cases, like the *Wilson* case, in which the disclosure of medical treatment would lead to nothing more than knowledge of minor or temporary ailments. Misrepresentations of this character are either treated as immaterial or as issues to be left to the jury. But this case is not one of them.

The issue before us concerns concealment of mental illness and chronic alcoholism. It is difficult to believe that an applicant with such a record would be regarded as insurable under standard rates of premium. In fact, there was tesitmony from the defendant that if the history of mental illness had been disclosed the risk would have been automatically rejected. As for chronic alcoholism, it has been held material to the risk as a matter of law. *Soltaniuk v. Metropolitan Life Insurance Co.*, 133 *Pa. Super.* 139, 2 *A.* 2d 501; *Johnson v. New York Life Insurance Co., supra.*

Plaintiff insists, however, that the evidence was insufficient to establish the materiality of the misrepresentations. He argues that under Delaware law materiality to the risk depends upon whether the illness or condition concealed "so far affects the physical condition that it may reasonably be held to form a

material factor in estimating the possible duration of the particular life and consequent safety of the risk, as distinguished from mere temporary aliments or affections"; citing *Equitable Life Assurance Society v. Wilson, supra.* Plaintiff says that there was no medical testimony that the mental illness and alcoholism from which Mrs. Gutowski had suffered would so far affect her *physical* condition as to constitute a material factor in estimating the possible duration of her life. The insurer, says plaintiff, does not regard mental disturbances as material to the risk; and as for chronic alcoholism its effect upon physical health must be established by affirmative testimony. Hence, says plaintiff, defendant failed in its proof.

The assertion that mental illness, as distinct from physical ailments, is not a matter in which the insurer is interested is somewhat startling. This idea is not only refuted by the testimony in the case, but it is on its face unsound. Mental illness may lead to total and permanent disability—a risk assumed by the policy in suit. If it had happened, the company would have been bound to waive the premiums and pay the face amount of the policy in installments. An insurance company has the right to select its risks, and it is impossible to think it would not be influenced in its decision to accept or reject an applicant by a history of mental illness. In fact, as above stated, question 22 on the Prudential application form inquires whether the applicant has ever had certain diseases, and "insanity" is one of those listed. As the foundation for this argument plaintiff has culled out of the opinion in the *Wilson* case a phrase—"physical condition"—appropriate to the facts of that case, and attempts to deduce from it the general principle that mental illness is not in itself a material factor in appraising a life insurance risk. This reasoning is unacceptable.

Also unacceptable is the argument that an insurer must show by medical opinion that chronic alcoholism is a material factor in estimating the probable duration of life. A condition or disease may be so serious that, as a matter of common knowledge, a court will be justified in pronouncing it material to the

risk. Would any one contend that a history of cancer is not material to the risk? So here, the insured's medical history disclosed a condition material as a matter of law. Since the facts were undisputed, and the insured knew them (or must be held to have known them), there was nothing to submit to the jury. A false and material misrepresentation was established. See the cases above cited.

■ For the foregoing reasons we are compelled to hold that the issue of materiality was erroneously submitted to the jury.

■ But plaintiff says that even if the misrepresentations were material to the risk, yet the conduct of its soliciting agent precludes the company from asserting the defense. Plaintiff relies on *Rust v. Metropolitan Life Insurance Co.*, 6 *W. W. Harr.* (36 *Del.*) 199, 172 *A.* 869. In that case plaintiff alleged that he had made true answers to the questions in the application, and had made disclosure of prior illness and medical treatment, but the soliciting agent had falsely written down negative answers to the questions directed to these matters. It was held on demurrer that the company could not take advantage of the incorrect answers, written by its agent, to defeat recovery on the policy. We do not question the correctness of this ruling. The question here is whether there are any facts proved requiring its application. Plaintiff charges the agent with fraud and the burden lies upon him to prove it. The facts he relies upon to create an issue for the jury are as follows:

Plaintiff and her husband were persons of limited education. The agent, Laurelli, was a college graduate. His duties were to collect premiums and sell more insurance if he could. He began collecting premiums from Mrs. Gutowski in August, 1948, and saw her on many occasions thereafter. He noticed nothing unusual about her. He solicited her for more insurance and filled out the application. He sold the insurance on August 21, 1950, but dated the application August 23. This was an error and he frequently made errors. After Mrs. Gutowski's death Lau-

relli told the plaintiff of the existence of the 1950 policy, and said "they will have a little trouble with it." Plaintiff also says that when Laurelli asked Mrs. Gutowski to "take a policy" she told him she would have to take a medical examination and didn't want any, and Laurelli told her he would give her a policy without one.

This is all that plaintiff has shown to prove fraud. There is no evidence that Mrs. Gutowski answered the questions truthfully; the agent testified that he correctly recorded her answers. There is no evidence that the agent knew of her hospitalization or of her alcoholism. At no time during the period when he was collecting premiums from her was she in the Delaware State Hospital. The error in the date of the application is unusual, but does not in itself show fraud. At the most it shows a lack of care. The statement that the agent told Mrs. Gutowski that he would give her a policy without medical examination is based on hearsay testimony, of slight or no probative value. Moreover, if taken at its face value, it shows on the agent's part nothing more than the statement of fact, viz., that no medical examination was required. In the light of facts now known, it might suggest that Mrs. Gutowski believed that she might have difficulty in passing an examination, but that inference does not help the plaintiff's case, since, as above stated, the agent is not shown to have any knowledge of any of the important facts.

The suggestion that insured's education was limited does not show that she was illiterate or of markedly inferior intelligence. She was twice given employment at the Delaware State Hospital as a beauty parlor helper. Her signature on the application for the 1950 policy is well written and is reasonably clear and firm. The agent's statement that there might be trouble about the fourth policy is readily referable to the questions of liability naturally suggested by the cause of death.

We think that the evidence falls far short of tending to prove any fraud on the part of the agent. The evidence points the other way. Mrs. Gutowski had, in applying for the first three

policies of insurance, likewise failed to disclose her confinement in the Delaware State Hospital. The first two applications were taken by agents other than Laurelli. The facts suggest that the insured herself was systematically withholding vital information respecting her condition.

The court below left this issue to the jury. Since we find that there was no evidence to support the charge of fraud, we must hold that the submission of the question was error.

## II.

The second issue concerns the policy clause providing for double indemnity in case of death occurring "as a result, directly and independently of all other causes, of bodily injuries effected solely through external violent and accidental means."

As above stated, Mrs. Gutowski was found dead on the morning of March 7, 1951. Analysis of a sample of her blood disclosed barbiturate poisoning. The percentage of such material found was .011, which in the opinion of the pathologist was a fatal dose. The circumstances leading to her death, so far as could be known, were as follows:

Beginning in December, 1948, Mrs. Gutowski had been under treatment by Dr. Thomas V. Hynes for fits of depression and nervousness, accompanying a change of life. He had also treated her for alcoholism. In September, 1949, and on several occasions thereafter he prescribed for her a drug called "Nembutal" (sodium pentobarbital), prepared in capsule form. The dosage prescribed was one capsule four times a day, and she had been instructed to take them not oftener than one every four hours. At some time before she died Dr. Hynes noticed that the capsules "disappeared a little faster than they should have", and advised her husband to keep them in his possession and allow only a day's dose to be kept at home. Mr. Gutowski's testimony indicates that this suggestion was not followed.

On the evening of March 6 Mr. Gutowski came home from work and changed his clothes. His wife was sitting in the par-

lor. He took the dog for a walk and then had his supper. He asked his wife how she felt and she replied: "I feel all right." About seven o'clock she said she was going to bed, and asked him to get her a can of beer. He went out and got the beer. Mrs. Gutowski drank the beer, or part of it, and went to bed. About an hour or so later she took one capsule. Mr. Gutowski went to bed about eight thirty and went to sleep. On waking next morning he put on the light in his bedroom. He shook his wife but could not waken her. He called her aunt and at some time between five and six o'clock Dr. Hynes was summoned. The doctor pronounced her dead at 6:35 a.m. and notified the coroner. The coroner found the cause of death to be "barbiturate poisoning, accidental". The company does not contend that it was suicide.

These are all the facts known about the death. They are undisputed, but the parties are in sharp disagreement upon the legal consequences.

The first issue between them concerns the construction of the policy's provision respecting death by "accidental means". Is there a distinction between "accidental death" and death by "accidental means"?

There are two lines of decisions upon the question, in sharp disagreement. One line rejects the distinction holding that any death that may be said to be "accidental", *i.e.*, unforseen and unexpected, is covered by the policy. The other line recognizes the distinction, and gives effect to the precise language of the policy clause. These decisions hold that the immediate or proximate cause of death must be accidental, and if death results as the natural and probable consequence of the voluntary act of the insured death does not occur by accidental means.

Delaware has adopted the latter view and recognizes the distinction.

The question first came before our courts in *Metropolitan Life Insurance Co. v. Landsman*, 1933, 5 *W. W. Harr.* (35

*Del.*) 384, 165 *A.* 563. After a thorough review of the decided cases, Chief Justice Pennewill, speaking for a three-judge court, announced approval of the distinction.[1]

In *Koester v. Mutual Life Insurance Co. of New York*, 1934, 6 *W. W. Harr.* (36 *Del.*) 537, 179 *A.* 327, the question came before the Supreme Court, the Chancellor, the Chief Justice and three other law judges sitting. That court also reviewed the authorities and expressly approved the holding of the *Landsman* case that accidental death is not the same as death by accidental means. In the *Koester* case death resulted from an attempt of the insured to gain control of a loaded firearm held by his wife. It was held that the discharge of the firearm was a natural consequence of the voluntary act of the insured, and that his own act was the direct cause of his death. Since his voluntary act was not accidental, his death did not occur by accidental means.

In *Szymanska v. Equitable Life Insurance Co.*, 1936, 7 *W. W. Harr.* (37 *Del.*) 272, 183 *A.* 309, the distinction was again recognized, and the authority of the *Koester* case followed, in an opinion by Chief Justice Layton, speaking for a three-judge court.

Plaintiff asks us to overrule these decisions as erroneous, but we think that the rule that they announce is too firmly grounded in our law to be disturbed now. There is high authority for the other view, but our rule can hardly be said to be clearly wrong, for the reasoning of our cases reflects a logical application of the doctrine of proximate cause—a field of considerable difficulty in which it is not surprising to find differences of opinion in applying the law.

Plaintiff suggests that the reasoning of the Delaware cases should be restricted to the facts of those cases. This suggestion we understand to mean that the cases are not authority for the

[1] It is unnecessary to consider whether the result reached in this case was correct.

rule of construction above discussed. This is plainly incorrect, for the rule was three times examined and approved. Plaintiff cites *Fulnettle v. North American Mutual Insurance Co.*, 1946, 4 *Terry* (43 *Del.*) 505, 50 *A.* 2d 614, as support for this argument. That case merely holds that the voluntary act of a third person does not bar recovery on a policy covering death by "unintentional, involuntary, and purely accidental means", because the word "unintentional" refers to the acts of the insured only. It has no bearing upon the present case.

We must therefore apply the rule of our cases to the facts before us.

The remaining issue between the parties concerns the sufficiency of the evidence to justify the finding of accidental means as the cause of death. The burden of proving accidental means was of course upon the plaintiff. The court below charged the jury with respect to the distinction between accidental death and death by accidental means, and instructed the jury that they must find by a preponderance of the evidence that there was some slip or mischance by reason of which Mrs. Gutowski took more tablets than she intended to take.

The question is, Was there any evidence of such a slip or mischance?

Certainly there was no direct evidence upon the matter. But if the mischance or mishap that the plaintiff had to prove may reasonably be inferred from the circumstances, the case was properly submitted to the jury. *Metropolitan Life Insurance Co. v. Jenkins*, 152 *Fla.* 486, 12 *So.* 2d 374. The difficulty with the plaintiff's case is that there is not a single circumstance in the case suggestive of a mischance or mishap in connection with her death. The medical evidence indicates that Mrs. Gutowski must have taken from six to twelve capsules. Since she took one about eight o'clock, she must have taken at least five, and probably more, before six o'clock the next morning. How could such a dose have been taken by mishap? There is an almost irresistible inference that when a person drinks or swallows any-

thing, he does so voluntarily. *Grosvenor v. Fidelity & Casualty Co.*, 102 *Neb.* 629, 168 *N. W.* 596. Even assuming that some physical mischance in handling the bottle or container is conceivable, yet the record is bare of any evidence indicating it.

It is suggested that Mrs. Gutowski may have miscounted the capsules because she was drowsy. Whether a mental error of this sort is an accident would seem to depend on the circumstances under which it occurs. In any event, the suggestion is pure speculation. As against this is the uncontradicted evidence that Mrs. Gutowski had on at least one occasion taken more capsules than the doctor had prescribed. From this fact an inference may be drawn that she believed she could safely take more than the prescribed dosage. Thus such evidence as there is points to the conclusion that she voluntarily took the overdose, miscalculating its effect. In those jurisdictions in which the rule of accidental means is adhered to recovery in such circumstances is denied. *McGinley v. John Hancock Life Insurance Co.*, 88 *N. H.* 108, 184 *A.* 593 (acute alcoholism from voluntarily drinking a quantity of a mixture of alcohol and ginger ale); *Aubuchon v. Metropolitan Life Insurance Co.*, 8 *Cir.*, 142 *F.* 2d 20 (death from overdose of veronal voluntarily taken); *Carnes v. Iowa's Traveling Men's Association*, 106 *Iowa* 281, 76 *N. W.* 683 (death from overdose of morphine under unknown circumstances); *Murphy v. Western & Southern Life Insurance Co.*, *Mo. App.*, 262 *S. W.* 2d 340 (death from overdose of paraldehyde under unknown circumstances). A verdict of mishap in the taking of an overdose of medicine cannot rest on speculation.

Plaintiff invokes the rule that where death occurs from external and violent means a presumption arises that death was likewise by accidental means. *Metropolitan Life Insurance Co. v. Jenkins, supra;* 29 *Am. Jur.* "Insurance", § 1443. This presumption is based, first, on the presumption against suicide or self-inflicted injury, and second, upon the rule that the law will not, in the absence of any evidence, assume that bodily injuries were intentionally inflicted upon the insured by a third person. But the presumption has no application here. If any presump-

tion is applicable to a case of the drinking of a beverage, or the swallowing of a medicine, it is to the contrary, for the act of drinking or swallowing is almost necessarily a voluntary one.

Plaintiff cites two cases of drowning under unexplained circumstances, both holding that the issue of accidental means was properly submitted to the jury. *Heffron v. Prudential Insurance Co. of America,* 144 *Pa. Super.* 307, 19 *A.* 2d 556; *Simoneau v. Prudential Insurance Co. of America,* 89 *N. H.* 402, 200 *A.* 385, 388. We are in accord with the holdings in these cases, but they do not help the plaintiff here. In the *Heffron* case insured had gone to the river shore to gather driftwood, as had been his habit. The river was swollen, and the current was swift, so that an element of difficulty, if not of danger, was present. In the *Simoneau* case insured had engaged in swimming in the course of play. He was a strong swimmer, but suddenly sank. There was evidence in each case that the insured had been in good health. In such circumstances drowning is not the natural or probable consequence of the voluntary act of the insured. But when one voluntarily takes a large overdose of barbiturates ("sleeping pills"), it is common knowledge that death may occur. It is a natural consequence of a rash act.

This is not to say that because an injury or death follows upon a voluntary act of the insured it cannot occur by accidental means. As the Supreme Court of New Hampshire said in the *Simoneau* case, *supra,* "there may be an infinite variety of cases, each presenting its own circumstances and its own issues of fact for the jury." Accordingly we do no more in this case than to apply the general rule to the particular facts. So applying it, we find that there is an entire absence of evidence of mishap in the taking of the medicine; that such evidence as there is points to the voluntary taking of a large overdose of barbiturates; and that death followed as the natural consequence.

Under the law as laid down in our decisions, we must hold that there was no evidence of death by accidental means

and must disagree with the holding of the trial court that the issue was one for the jury.

We are thus compelled to resolve both issues in this case against the plaintiff.

The judgment below is reversed. The cause is remanded to the Superior Court of New Castle County, with instructions to vacate the judgment for plaintiff and enter judgment for the defendant.