IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

KEITH MULROONEY and )
HOLLY MULROONEY, )
husband and wife, )
          )
      Plaintiffs, )
          )
      v. )      C.A. No. N11C-04-192 JAP
          )
LIFE INSURANCE COMPANY )
OF THE SOUTHWEST, )
FRANK L. TOMAZINE, )
PIKE CREEK FINANCIAL GROUP, )
INC. )
          )
      Defendants. )

## MEMORANDUM OPINION
### (Corrected)

This case is about the consequences of signing an insurance application without first reading it. The Mulrooneys' application for insurance contained an incorrect statement of Mrs. Mulrooney's height which was written on the application by the agent of the insurer. The Mulrooneys concede that they were told that the statements on the application were important, that the policy might be voided if any of them were incorrect, and that they should read the application before signing it. Nonetheless, Mrs. Mulrooney merely glanced at the application and signed it without correcting the misstatement of her height. Four months later, Mrs. Mulrooney suffered a non-fatal stroke. The insurer now seeks to void the policy because of the material misstatement of Mrs. Mulrooney's height. The court holds that the Mulrooneys are bound by the misrepresentations contained in the application they signed. The Mulrooneys do not dispute the

misrepresentation about her height and the insurer is therefore entitled to void the policy.

## A. Procedural History

The Mulrooneys have brought suit against Life Insurance Company of the Southwest ("LSW"), a local insurance agency, Pike Creek Financial Group, and Frank Tomazine, an insurance agent employed by Pike Creek. In 2008 the Mulrooneys purchased, through Mr. Tomazine, an LSW life insurance policy on the life of Mr. Mulrooney with a rider naming Mrs. Mulrooney as an other insured. It is undisputed, and the court so finds, that Mr. Tomazine and Pike Creek were acting as the agents of LSW at all times pertinent to this dispute.

The LSW policy contained an accelerated benefits rider which provided that under certain circumstances the insureds could receive some portion of the death benefits even if the insured did not die. Four months after they purchased the policy Mrs. Mulrooney suffered a non-fatal stroke which they contend entitles them to benefits under the accelerated benefits rider. LSW denied coverage claiming, among other things, that Mrs. Mulrooney materially misstated her height on the insurance application. The Mulrooneys deny this and also claim that any misstatement on the application was attributable to Mr. Tomazine, who filled out the application forms for the Mulrooneys before they signed them.

After being told they would receive no benefits the Mulrooneys brought suit against Mr. Tomazine, Pike Creek and LSW. They charge Mr. Tomazine and Pike Creek with breach of contract and negligence, and they assert claims of breach of contract and bad faith against LSW which filed a counterclaim seeking a

2

declaratory judgment that it is entitled to void the policy because of several alleged misrepresentations in the applications by the Mulrooneys. After discovery all of the defendants have moved for summary judgment. In their motion Pike Creek and Mr. Tomazine together argue, among other things, that they owed no duty of care to the Mulrooneys and they had no contractual relationship with them. LSW argues that, because of Mrs. Mulrooneys alleged misrepresentation of her height, it is entitled to void the policy.[1]

Today the court finds from the undisputed facts that Mrs. Mulrooney materially misrepresented her height in the application and, therefore, LSW is entitled to void the policy. As a result of this holding, the Mulrooneys bad faith claims against LSW are moot. The court will momentarily defer ruling on the Tomazine/Pike Creek motion in order to give the parties an opportunity to comment on the effect, if any, of today's ruling on the claims against these defendants.

### B. Background Facts

The following are undisputed facts taken from the record. These facts are based, for the most part, on the Mulrooneys' deposition testimony. There are occasional facts based upon testimony of others, but in each instance the Mulrooneys offer no evidence to dispute that testimony. Not all of the facts described here are material and some are included simply to provide context. The

---

[1] For purposes of its motion, LSW relied exclusively on Mrs. Mulrooney's alleged misrepresentation of her height. In doing so, it has not waived its contention that other alleged misrepresentations in the application by Mrs. Mulrooney also justify voiding the policy.

3

facts which the court deems to be material are repeated in summary fashion in the next section of the opinion.

*The Mulrooneys look for replacement life insurance*

In 2008, Family Benefits Marketing Company (which is not a party to this litigation) mailed to Plaintiffs and others an unsolicited flyer advertising life insurance. The flyer asked the recipient (in this case the Mulrooneys) to fill out a brief questionnaire at the bottom and return it if they were interested. The Mulrooneys were interested in replacing their existing $100,000 policy with Prudential because they had just purchased a home and wanted a policy with limits of $250,000 to cover their new mortgage and pay funeral expenses. Accordingly, they returned the questionnaire to Family Benefits, which in turn forwarded it to defendant Pike Creek Financial Group.[2]

Shortly after receiving the Mulrooneys' expression of interest an employee of Pike Creek, Kim Gotschall, telephoned the Mulrooneys and interviewed Mr. Mulrooney over the phone using questions from a pre-prepared script as her guide. Those questions called for, among other things, information about the applicants' height and weight. According to Ms. Gotschall, she routinely made notes of such conversations on the script, and she did so during her conversation with Mr. Mulrooney.

---

[2]  It is unclear from the record what information was sought in the marketing questionnaire. LSW does not contend that it was misled by the Mulrooneys' response. Likewise, the Mulrooneys do not argue that the information they allegedly withheld was supplied to LSW in their response to the marketing questionnaire. The court concludes therefore that the contents of the marketing questionnaire and the Mulrooneys' response are not pertinent to the issues raised in the present motion.

*The notion Mrs. Mulrooney was 5 feet 8 inches tall*

There are two contemporaneous documents which show that after her telephone call with Mr. Mulrooney, Ms. Gotschall believed that Mrs. Mulrooney was 5 feet 8 inches tall. The first is the note made by Ms. Gotschall during the interview wherein Ms. Gotschall wrote that Mrs. Mulrooney was five feet eight and weighed 275 pounds. The second is an email sent shortly thereafter by Ms. Gotschall to two potential underwriters. In that email Ms. Gotschall wrote:

> I have a 26 year old female who is 5' 8" and 275 pounds—no meds—non smoker—no medical issues. Please rate.

There is no evidence that defendant Mr. Tomazine was aware of Mrs. Mulrooney's ostensible height and weight at the time Ms. Gotschall conducted the telephone interview and sent the email to the underwriters.

*The meeting between Tomazine and the Mulrooneys*

LSW responded to Ms. Gotschall's email saying it would consider issuing a policy to the Mulrooneys. Someone at Pike Creek then scheduled a meeting between Mr. Tomazine and the Mulrooneys. The meeting took place in the living room of their home on July 15, 2008. Mr. Tomazine and the Mulrooneys (occasionally joined by their infant and toddler) were the only persons at the meeting. According to the Mulrooneys, the first portion of the meeting consisted of Mr. Tomazine asking some questions about their insurance needs and describing insurance products which were available. During the second phase of the meeting, Mr. Tomazine asked each of the Mulrooneys medical questions "from a sheet" and wrote down their answers on that sheet. (The Mulrooneys did not have

5

a copy of the papers when Mr. Tomazine was filling them out.) From time to time the Mulrooney's asked for clarification about the scope of the questions and they recount that occasionally Mr. Tomazine told them certain information need not be disclosed.

The Mulrooneys advanced one version in their complaint of what occurred at that meeting and also testified about it in their depositions. Those versions differ in some respects, but the discrepancies are not material to the issue now before the court. For example, in their amended complaint they allege:

> Tomazine asked Holly about her height and weight. Holly stated that she was not sure of her exact measurements. Tomazine suggested that she consult her driver's license. Holly gave Tomazine her driver's license. Tomazine then entered Holly's height and weight on the . . . application.

At her deposition, on the other hand, Mrs. Mulrooney testified she distinctly recalled *telling* Mr. Tomazine that she was 5 feet 4 and weighed approximately 275 pounds. She did testify that Mr. Tomazine asked for her driver's license which she gave to him. Her driver's license could not, however, have been the source of Mrs. Mulrooney's weight listed on the application. That license, which was issued less than four months before the meeting, listed Mrs. Mulrooney's weight as only 174 pounds.

*The completed application form*

Mr. and Mrs. Mulrooney signed separate, but identical, two page application forms which were filled out by Mr. Tomazine at the time he met with them. Both pages contained spaces where information was to be written in, as well as questions to be checked off with yes or no answers. The questions on the

6

first page related primarily to personal and background information (such as the names of the beneficiaries), whereas the second page was devoted to health questions.[3] The top portion of that page contained a blank where the applicant was to supply his or her height and weight. There is no dispute that Mr. Tomazine listed in the appropriate spaces her height as "5' 8"" and her weight as "275." Following that is a series of 19 maladies which the applicant is to disclose whether "in the last 10 years [the applicant has] been diagnosed, treated, taken medication for, or know of any indication of any" of the listed maladies. The applicant is to check a box marked "yes" or a box marked "no" for each of the conditions listed. Following that there are five questions soliciting yes or no checks for past and anticipated future medical testing. The form asks for brief information about parents and siblings including their "State of Health." Finally, the form provides space where "yes" answers should be explained.[4] There is nothing vague or confusing about the questions Mrs. Mulrooney is alleged to have falsely answered, particularly the question about her height. Indeed, when asked at her deposition Mrs. Mulrooney agreed that the pertinent questions were not confusing.

The application signed by Mrs. Mulrooney contained several alleged errors or omissions. As noted, a check-off form in the application asked "in the last 10 years have you been diagnosed, treated, taken medication for, or know of having any indication of any:"

      c. Emphysema, Pleurisy, Asthma or Lung Disease;

---

[3] Mrs. Mulrooney testified she remembers Mr. Tomazine asking health questions from a sheet of paper during the meeting.

[4] The space for providing explanations is not limited. There is a form which can be used if additional space is needed.

7

f.  Nervous disorders or headaches;

g.  Spine, Bones, Muscles, Joints, Skin or Gland Disorder;

i.  Veins, Arteries, Blood or Blood Pressure Disorder.

Mrs. Mulrooney answered "No" to each of these questions.  But her medical records and deposition testimony show that:

- *Emphysema, pleurisy, asthma or lung disease.*

  Mrs. Mulrooney had, in her own words, a "long history" of breathing problems.  Although she denied in her deposition she ever had asthma, she admitted to having difficulty breathing in the presence of allergens and in cold weather.  In October, 2006 she was taken to the emergency room because of her difficulty breathing.  The physicians there diagnosed her with asthma.  Other medical records written before the Mulrooneys completed the insurance application also show a diagnosis of asthma.  In a history taken by Dr. Bae, the neurologist who treated Mrs. Mulrooney for her stroke, he recorded that Mrs. Mulrooney had a history of asthma.  Finally Mrs. Mulrooney had been regularly using the medication albuterol which she administered through a nebulizer, which is a common treatment for asthma.

- *Nervous disorders or headaches.*

  A November 2008 Emergency Room record recites Mrs. Mulrooney had a history of migraines.

8

- *Spine, bones . . . disorder*

    In 2007 Mrs. Mulrooney went to the emergency room complaining of pain that "felt like fire" from her neck down. She was diagnosed with a cervical radiculopathy.

- *Blood pressure disorder*

    A 2007 note written by Mrs. Mulrooney's obstetrician during her pregnancy states she had high blood pressure. Mrs. Mulrooney was referred to her family doctor for treatment.

The application also asked about medications Mrs. Mulrooney used. She listed "meds to keep triglycerides low" and "meds for acid reflux." She made no mention, however, of the albuterol she used from time to time. Mrs. Mulrooney offers justifications for these apparent omissions, including that Mr. Tomazine told her the omitted information need not be disclosed on the application. Fortunately the court need not consider the significance, if any, of these alleged omissions.

For purposes of the instant motion, LSW has chosen to use a rifle and not a shotgun, and relies only upon the misstatement of Mrs. Mulrooney's height. The court will therefore limit its consideration to the responses provided by Mrs. Mulrooney about her height. The answer written on the form indicates that she was 5 feet 8 inches tall and weighed 275 pounds. Plaintiffs admit that Mrs. Mulrooney is not 5 feet 8 inches tall, but is in fact between 5 feet four inches and 5 feet five. When shown the application at her deposition she testified she had no

idea why Mr. Tomazine wrote she was 5 feet 8. With respect to the stated weight of 275 pounds, LSW has adduced evidence that, less than four months after the application was signed, Mrs. Mulrooney weighed 322 pounds when she was taken to the hospital for her stroke. Still, because this is a motion for summary judgment the court will consider the 275 pounds stated by Mrs. Mulrooney to be accurate.

*Mrs. Mulrooney is aware of the importance of accuracy*

It is undisputed that Mrs. Mulrooney was well aware of the significance of her answers and that they be full and complete. Mr. Tomazine testified at his deposition that after filling out the form he reminded the Mulrooneys of the importance of the application's accuracy and advised them they should read the form before signing it. According to Mr. Tomazine:

> When I get to the end of the application proves. . . I want to cover my butt. Okay? And so when I get to the end, I basically say to the client, what you are signing is every question I have asked you is truthful to the best of your knowledge. You have not withheld any information that is pertinent to the underwriting of this insurance policy. You are giving the insurance company permission to look at things like the Medical Information Bureau. You are certifying that the Social Security number you gave me is yours and not somebody else's. You are acknowledging receipt of your conditional receipt and your FCR report. But, most importantly, Lisa, what you are signing is that not only did you provide me with accurate information, but it has been recorded accurately as well. So before you sign, I need you to review, initial, review, and sign.

Mrs. Mulrooney confirmed at her deposition that Mr. Tomazine told them of the importance of correct answers.

Q. Before you signed the application did Mr. Tomazine make a statement to you to the effect that what you were signing is every question I have asked you is truthful to the best of your knowledge, you have not withheld any information that is pertinent to the underwriting of this insurance policy?

A. Yes, I remember that.

Q. He did make that statement to you?

A. Yes.

Q. Did he go on to say something to the effect that, most importantly, what you are signing is that not only did you provide me with accurate information but that it has been recorded accurately as well?

A. Yes.

Later in her deposition Mrs. Mulrooney was questioned at length confirming that she understood at the time that LSW would rely upon her representations and that the policy could be cancelled if anything on the application was untrue:

Q. At the time you and Mr. Tomazine filled out your part of the application, did you understand that LSW was going to review this information?

A. Yes.

Q. Did you understand that they were going to rely on this information as being accurate for purposes of deciding whether or not to issue you the policy or at what premium level?

A. Yes.

Q. Did you understand from your conversations with Mr. Tomazine and the types of questions he was asking you, did you have a belief or understanding that your answers were important?

A. Yes.

11

Q. Did you understand that your answers, whether or not they were correct was important?

A. Yes.

Q. What was your understanding of what could happen—well, why they were important?

A. Because you need to know that information, for instance, like if I had strokes in the past and I had a stroke, and I died from it you wouldn't cover it because I didn't tell the truth.

Q. So you understand the importance of telling the truth with respect to being issued a policy and having claims paid, correct?

A. Yes.

Q. And you knew that at the time Mr. Tomazine was filling out the application with you?

A. Yes.


*The Mulrooneys review and sign the applications.*

There is nothing in the record suggesting that Mr. Tomazine rushed the Mulrooneys into signing the applications or attempted to limit the time they had to review them before signing. Mrs. Mulrooney understood that she was to review the application for any errors by Mr. Tomazine:

Q. And what were you looking for when you gave it a quick look?

A. Just to kind of make sure that everything that I said to him was okay on here.

Q. In other words, that what you had told him he had accurately recorded in the application?

A. Yes.

12

Yet despite her awareness of the importance of the accuracy of her answers, Mrs. Mulrooney barely glanced at it before signing it:

> Q.  Did you read the questions in this application before you signed it?
>
> A.  Word for word, no.
>
> Q.  Did you read them at all?
>
> A.  Just vaguely glanced.
>
> Q.  Okay.  How much time did you take to review the actual application for accuracy before you signed it?
>
> A.  Not long.

When asked at her deposition why she did not take more time to review the document Mrs. Mulrooney did not blame Mr. Tomazine.  Rather, she explained, she had to leave for work:

> Q. Why is that [so little time]?  Why didn't you take more time to go through and make sure that what was here was accurate?
>
> A.  Because I wasn't—I remember that when I had it, I kind of like, was like, okay, like really like that (Indicating).  And then I had to leave for work, so I had to go.
>
> Q.  Otherwise, if you had taken more time to look at this you would have been late for work?
>
> A.  Yes.

Mrs. Mulrooney signed the application.  Just above her signature is a paragraph which begins "I understand and agree that all answers given above and in any medical exam are to the best of my knowledge and belief complete and true."

*The policy is delivered to the Mulrooneys*

At some undetermined (but immaterial) time later Mr. Tomazine received the Mulrooneys' policy from LSW. He drove to the Mulrooneys' home and personally delivered it to Mr. Mulrooney.

The policy consisted of the agreement itself, the riders, certain data sheets and the application submitted by the Mulrooneys. The first page of the policy states, in plain English, that the application was part of the policy: "the entire contract between the parties consists of this policy, the attached copy of the application, and any other riders...." The policy once again reminded the Mulrooneys that any statement they made in the application can be used to void the policy.[5] The cover page of that policy advised the Mulrooneys of their right to review it:

> This policy may be returned to us at any time prior to the end of the tenth [extended to the twentieth by addendum] following its receipt by the Owner. The policy may be returned in person or by mail to us or to the agent through whom it was bought. Upon such return, we will refund any premiums paid, and the policy will be deemed void as of its Date of Issue.

Mrs. Mulrooney was aware the policy had been delivered to her home, but she never looked at it.

*Mrs. Mulrooney's stroke*

---

[5] "Any statement made by the Insured shall be deemed a representation and not a warranty. *Unless such statement is in the attached application* it shall not be used to . . . make this policy void." (emphasis added).

14

Less than four months after signing the insurance application, Mrs. Mulrooney had a non-fatal stroke. That stroke prompted her to apply for benefits under the accelerated benefits rider in her insurance policy. LSW denies coverage, thus giving rise to this lawsuit.

### C. Material facts

The following facts are material to the court's resolution of the pending motion. They are almost all undisputed. In those few instances where there is a factual dispute, the court has assumed the version most favorable to the Mulrooneys is true.

- At all times pertinent hereto, defendant Tomazine was an agent of LSW.

- Mr. Tomazine met with the Mulrooneys at their home on July 15, 2008.

- During the meeting Mr. Tomazine asked each of the Mulrooneys health-related questions based upon an application for LSW insurance.

- As the Mulrooneys answered the health questions Mr. Tomazine filled in the application form.

- Two of the questions asked of Mrs. Mulrooney were her height and weight.

- Mrs. Mulrooney told Mr. Tomazine she was between 5 feet 4 and 5 feet 5 inches tall. She told Mr. Tomazine she weighed approximately 275 pounds.

15

- While Mr. Tomazine was completing the application form for Mrs. Mulrooney, he wrote down that she weighed 275 pounds but incorrectly wrote down that she was 5 feet 8 inches tall.

- Mrs. Mulrooney's actual height was between 5 feet 4 and 5 feet 5 inches.

- After he finished filling out the forms, Mr. Tomazine told the Mulrooneys that it was important that the information listed on the form was correct and that the policy could be voided if it was not.

- Mr. Tomazine advised the Mulrooneys to read the application carefully before signing it.

- Mrs. Mulrooney understood that LSW would rely upon the information she provided. She understood this information was important and that LSW could void her policy if any of the information on the application was untrue.

- Mrs. Mulrooney had the opportunity to review the application before signing it. Mr. Tomazine did not rush her into signing.

- Mrs. Mulrooney just glanced at the application. She signed it without reading it word for word because she had to leave for work.

- Just above her signature the application form states "I understand and agree that all answers given above and in any

16

medical exam are to the best of my knowledge and belief complete and true."

- Sometime after the meeting, Mr. Tomazine delivered a copy of the issued policy to the Mulrooneys at their home.

- The policy recites that the application signed by the Mulrooneys was deemed to be part of the policy, and copies of the Mulrooney applications were physically attached to the policy delivered to them.

- Mrs. Mulrooney never read the policy or the attached copy of her application after Mr. Tomazine delivered it.

## D. The standard to be applied

LSW has the burden of proof with respect to its claim for rescission. Although the parties have not discussed it in the briefs, this has some significance when determining the standard to be applied to its motion.

The standard to be applied in summary judgment motions is a familiar one.

> We must determine "whether the record shows that there is no genuine material issue of fact and the moving party is entitled to judgment as a matter of law." When the evidence shows no genuine issues of material fact in dispute, the burden shifts to the nonmoving party to demonstrate that there are genuine issues of material fact that must be resolved at trial. If there are material facts in dispute, it is inappropriate to grant summary judgment and the case should be submitted to the fact finder to determine the disposition of the matter.[6]

---

[6] *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 144 (Del. 2009).

Typically this means that when a defendant moving for summary judgment points to the absence of evidence supporting an element of plaintiff's case. The United States Supreme Court has noted "as we have explained, the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."[7]

Where, as here, the party bearing the burden of proof is the moving party, the analysis shifts slightly. LSW cannot rest its motion upon the assertion that the Mulrooneys have failed to adduce proof of something; rather it must initially come forward with evidence supporting all of the elements of its own claim. A party bearing the burden of proof at trial has "the burden of supporting [its] motion[] with credible evidence ... that would entitle [it] to a directed verdict if not controverted at trial."[8] As discussed below, LSW has come forward with undisputed evidence showing it is entitled to judgment on its claim.

### F. Analysis

**1. Delaware statutory law permits rescission if the representation about Mrs. Mulrooney's height is attributable to her.**

The court begins with an examination of the statutory framework surrounding this claim. A Delaware statute provides that "[a]ll statements and descriptions" contained in an application for insurance are deemed to be

---

[7] *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

[8] *In re Bressman*, 327 F.3d 229, 237 (3rd Cir. 2003)(internal quotation marks omitted). The Court of Appeals quoted Justice Brennan's dissenting opinion in *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). As the Court of Appeals noted, "Justice Brennan's dissent does not differ with the opinion of the Court regarding the appropriate standards for summary judgment. The disagreement is with respect to the application of those standards to the record before the Court in *Celotex.*" 327 F.3d at 237, n.3. Other Courts of Appeals have followed *Bressman.* E.g., *Johnson v. Hix Wrecker Serv., Inc.,* 651 F.3d 658 (7th Cir. 2011).

representation and that an insurer may rely upon an incorrect statement to void a policy if the incorrect statement was material to the risk or if the insurer would not have issued the policy (or issued the policy at an increased premium) had it known the true facts. Section 2711 of title 18 provides:

> All statements and descriptions in any application for an insurance policy or annuity contract by or in behalf of the insured or annuitant shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of facts and incorrect statements shall not prevent a recovery under the policy or contract unless either:
>
> (1) Fraudulent; or
>
> (2) Material either to the acceptance of the risk or to the hazard assumed by the insurer; or
>
> (3) The insurer in good faith would either not have issued the policy or contract, or would not have issued it at the same premium rate or would not have issued a policy or contract in as large an amount or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.[9]

The Mulrooneys argue that LSW "opted out" of section 2711 because it required only that the applicants answer the application questions "to the best of my knowledge and belief are complete and true." They argue section 2711 makes insurance applicants strictly liable for any misstatements whereas the LSW application requires LSW to show something more—that the statements were not to the best of the applicant's knowledge and belief. Citing to this court's opinion

---

[9]  18 *Del. C.* § 2711.

19

in *Dickson-Witmer v. Union Bankers, Ins. Co*[10] the Mulrooney's argue that LSW's decision to employ the more lenient "knowledge and belief" standard (from the applicant's point of view) means that section 2711 does not apply to this case.

The court need not explore its opinion in *Dickson-Witmer* in detail. Suffice it to say that the *Dickson-Witmer* court expressly found there were *no* untrue statements in the application, thus making its consideration of section 2711 dictum. More importantly, it does not matter which standard is applied—strict liability or "knowledge and belief"—if Mrs. Mulrooney's statement that she was 5 feet 8 attributable to her, it satisfies the "knowledge and belief" standard because she had actual knowledge she was only between 5 feet 4 and 5 feet 5.

Section 2711 permits an insurer to void a policy because of an untrue statement (even if the "knowledge and belief" standard is applied) when the statement is material or when the insurer "in good faith would either not have issued the policy or contract, or would not have issued it at the same premium rate."[11] Nowhere do the Mulrooneys argue that the misstated height was immaterial, nor do they contest that had LSW known her true height it would either ave not issued the policy or issued it at an increased premium. Health risks can be approximated by body mass index, and if Mrs. Mulrooney's true height were used the increase in her body mass index (and the increase in her risk of future health problems and premature death) would have been substantial. Courts routinely hold "nondisclosures of serious disease or ailments

---

[10]    1994 WL 164554 (Del.Super.)
[11]    18 *Del. C.* § 2711 (b)(c).

20

to be material as a matter of law."[12] In any event, because the Mulrooneys did not contest the issue, the court finds that the misstatement of Mrs. Mulrooney's height, if attributable to her, was material and would have caused LSW to charge an increased premium if indeed it issued a policy at all.

### 2. The representation about Mrs. Mulrooney's height is attributable to her because she signed the application

The principal issue here is whether the statement in the application is attributable to Mrs. Mulrooney. "It is a fundamental principle in insurance law that both the insured and the insurer have a duty to deal with each other with utmost fairness."[13] When completing an insurance application, particularly one for health or life insurance, the applicant has a duty to accurately disclose the information requested by the insurer.[14] Where the duty of utmost fairness is not met due to applicant's knowledge, Delaware courts have "consistently held" that a court may grant rescission on an insurance contract based on misrepresentation.[15] Included in this duty of "utmost fairness" is a duty on the part of the applicant to insure that the representations on the application are correct.[16]

The Mulrooneys do not dispute that the representation on the application that she was five feet eight inches tall was untrue. They also do not dispute that this untrue statement was material to the issuance of the policy. Their defense is

---

[12] *Brasure v. Optimum Choice Ins. Co.* 37 F.Supp. 2d 340, 346 (D.Del. 1999).
[13] *Oglesby v. Penn Mut. Life. Ins.Co.*, 877 F.Supp. 872, 888 (D.Del. 1994) (applying Delaware law and collecting Delaware cases).
[14] *Id.*
[15] *Id.* at 889.
[16] *See id.*

21

that because the notation was written by LSW's agent, LSW is estopped from relying upon it in its efforts to void the policy. They primarily rely upon *Rust v. Metropolitan Life Insurance Co.*,[17] an eighty year old decision in which this court held that an agent's misstatement when completing an insurance application may be attributable to the insurer, notwithstanding that the applicant signed the application containing the erroneous material. Their reliance upon *Rust* is misplaced because that opinion is no longer good law.

### a. This court's 1934 opinion in *Rust*

In *Rust* the insurance company sought to void a policy because of certain false answers to medical questions on the policy application. According to the complaint in *Rust*, the carrier's agent completed the application based upon the answers given to him by the applicant and, once completed, the applicant signed the application. The complaint also alleged that the applicant gave truthful answers to the agent but that the agent substituted false answers which were designed to enhance the chances the policy would be issued. The *Rust* court reviewed the then extant case law and concluded:

> In considering the questions which have arisen, a majority of the Courts have held that the applicant, notwithstanding the fact that he had signed the application, was not bound by the incorrect answers to questions contained in the application **which are written in by the agent of the Company without his consent**. And further, that the Company could not take advantage of the incorrect answers to the questions in the application, written in by its agent, without the consent of the applicant, in order to defeat a recovery on the policy.[18]

---

[17]  172 A. 869 (Del. Super. 1934).
[18]  *Id.* at 871 (emphasis added).

This court held that the applicant could defend the claim for rescission on the basis that the misrepresentations were attributable to the company, not him.

### b. The law has changed since *Rust* was decided

Time has eroded the basis for *Rust,* and over the years what it perceived to be the majority rule has changed. Although it is still the general rule that an insurer is bound by the acts of its agent, that rule "has been overridden by the signature of an applicant on the policy or application" where the application contains some sort of representation by the applicant that the statements in the application are accurate.[19] Another indication that *Rust* is antiquated is the fact that the opinions discussed and relied upon in *Rust* are themselves, for the most part, no longer good law. For example, *Rust* cited the 1891 Kentucky case of *Wright's Adm'r v. Northwestern Mutual Life Ins. Co,*[20] but times have changed and in 1968 the same court held that an illiterate insurance applicant was bound by the answers on an application filled by the insurance agent:

> The rule gleaned from the statute, as so construed, is that when the falsity of the representation is established and its materiality is not disputed, there can be no recovery. This is true despite the illiteracy of the applicant. The cases cited say that an illiterate shall not permit an application to be signed for him until he has had a responsible person to examine for correctness the answers inserted by the agent. It is admitted by appellee that the applicant had his son at his side who could have checked the accuracy of the answers in the application. In each of the cases cited, the fact that the agent had inserted false answers did not relieve the applicant of this responsibility.[21]

---

[19] 6 Couch, *Couch of Insurance* § 65:28 (2014).
[20] 15 S.W. 242, 243 (Ky. 1891).
[21] *Ky. Central Life Ins. Co. v. Combs*, 432 S.W.2d 415, 417 (Ky. 1968).

23

The *Rust* court also cited the Indiana Supreme Court's 1894 opinion in *Michigan Mut. Life Ins. Co. v. Leon.*[22]    Several years after *Leon,* the Indiana legislature enacted a statute which made the insurance application part of the policy.  As a result, the applicant bears the burden of reading the application to ensure the answers he or she gave are accurate:

> In view of the foregoing declarations of the law relative to insurance contracts, we are of the opinion that an insurance contract is controlled by the same law as any other contract and that there never has been any sound reason why such a contract should be looked upon in other light. We believe that the Legislature had a purpose in view when it said: 'That the policy, together with the application therefor, a copy of which application shall be attached to the policy and made a part thereof.' It had the power and right to pass such legislation and we can conceive of no other reason than to conclude that it was passed for the good of both the insurer and the insured. *It protects the insured by giving him the opportunity of examining the application when it is returned to ascertain if his answers were correctly written pursuant to the answers made by him, and, if not, to notify the company and have them corrected.* It protects the company from paying unjust and fraudulent claims, and at the same time it protects honest policyholders from paying increased premiums on account of payments to dishonest and fraudulent policyholders. It places insurance contracts on the same basis as other contracts and we have failed to find any well-reasoned opinion of any court to place such contracts on any other basis.[23]

Even in Delaware time has eroded whatever vitality *Rust* may have once had.  In their brief the Mulrooneys refer to the "*Rust* line of cases" as supporting their position. There is no such thing, at least as envisioned by the Mulrooneys.

---

[22]   37 N.E. 584 (Ind. 1894).
[23]   *Metropolitan Life Ins. Co. v. Alterovitz,*  14 N.E.2d 570, 576 (Ind. 1938)(emphasis added).

Although there are a few Delaware cases which mention *Rust* for one proposition or another, none actually applies its holding and precludes an insurance carrier from seeking rescission because its agent erroneously filled in an application later signed by the applicant. More current cases (both in Delaware and the local federal court) hold that the applicant is responsible for reading the application and insuring that when the applicant "had an opportunity to correct any inadvertent mistakes contained in his answers to the critical questions to which he failed to give adequate answers" the insurance carrier base a claim for rescission on those answers even though they were filled in by its agent.[24] Those cases are discussed below.

### c. *Rust* is not binding on this court

The Mulrooneys argue that this court is obligated to follow *Rust* because it was "approved" by the Supreme Court in *Prudential Ins. Co. of America v. Gutowski.*[25] A close reading of *Gutowski* shows that although the Supreme Court had some *bons mots* for the *Rust* opinion, it never followed it. Rather the *Gutowski* court simply held that *Rust* would not apply to the facts before it. Thus the comments about *Rust* were dictum.

The Delaware Supreme Court has on occasion described dictum in its own opinions as not constituting binding precedent.[26] At other times, it has found "a passing mention of liability insurance in the dicta" to be "unpersuasive"[27] and,

---

[24] *American Cas. Co. of Reading, Pa. v. Ford*, 187 A.2d 425, 427 (Del. Ch 1963).
[25] 113 A.2d 579 (Del. 1955).
[26] *Humm v. Aetna Cas. and Sur. Co.*, 656 A.2d 712, 715 (Del. 1995) ("This language is *obiter dicta* and is, therefore, not binding as legal precedent").
[27] *In re Krafft-Murphy Co., Inc.*, 82 A.3d 696, 707 n.68 (Del. 2013).

yet at other times, has confined earlier dicta "to the facts of that case."[28] As an inferior court, this court must tread carefully when determining whether language from a Supreme Court opinion was intended as a principle to be followed by the lower courts, or whether it is dictum intended to only provide context to its holding. As one federal court well put it, "there is dicta and then there is dicta, and then there is Supreme Court dicta."[29]

This court concludes that the language in *Gutowski* was not intended as binding precedent:

- One would expect that had the Supreme Court intended *Rust* to be the law of this state there would have been a critical examination of it. Yet, nowhere in *Gutowski* did the Supreme Court make a single mention of the authorities cited in *Rust,* nor did it examine or even discuss the rationale employed by this court in *Rust.* Indeed, the entire discussion of *Rust* in the *Gutowski* opinion consumed only two sentences.

- By the time *Gutowski* was decided, the opinion in *Rust* was already more than twenty years old. Yet, the *Gutowski* court did not consider whether there were any intervening opinions, from Delaware or elsewhere, which might cause it to rethink the *Rust* rationale.

---

[28]  *In re J.P. Morgan Chase & Co. S'holder Litig.,* 906 A.2d 766, 774 (Del..,2006).
[29]  *Schwab v. Crosby,* 451 F.3d 1308, 1324 (11th Cir. 2006).

Given the ambiguous language in *Gutowski,* the absence in *Gutowski* of any analysis of *Rust* or the cases upon which the *Rust* court relied, and the absence in *Gutowski* of any discussion of the cases following *Rust,* this court concludes that the Supreme Court did not intend its comments about *Rust* as signifying the law of Delaware. This conclusion is supported by the absence of any judicial endorsement of the Mulrooney's view of *Gutowski.* Although *Gutowski* has been cited by the courts for propositions relating to the duty of insurance applicants to disclose pertinent information;[30] the materiality of withheld information;[31] and determining whether a death was the result of an accident or suicide,[32] it has never been cited for "approving" *Rust.*

### 3. Mrs. Mulrooney is bound to the representations because she signed the application

*People are free to sign legal documents without reading them, but the documents are binding whether read or not. The failure to read a document before signing it does not enable one to ignore the obligations imposed by that document on the ground that they did not read the contract or that the contents of the contract were not known to the party.*[33]

Whatever ambiguity there may be about *Gutowski*'s "approval" of *Rust,* there is absolutely none about the legal repercussions of signing a document. In *Graham v. State Farm Mut. Auto. Ins. Co*[34] the Supreme Court was faced with insureds who were seeking to avoid an arbitration clause in an insurance policy

---

[30] *Pacific Ins. Co. v. Higgins,* 1992 WL 212601 (Del. Ch.); *Oglesby*, 877 F.Supp.at 888-89.
[31] *Prudential Ins. Co. of America v. Ford*, 144 A.2d 234 (Del.Ch. 1958); *Oglesby*, 877 F.Supp. at 889.
[32] *Campbell v. Stonebridge Life Ins. Co.* 966 A.2d 347 (Table); *Maneval v. Lutheran Broth.* 281 A.2d 502 (Del.Super. 1971).
[33] *Moore v. O'Connor*, 2006 WL 2442027 (Del.Super.) (*quoting* 17A Am.Jur.2d Contracts § 210).
[34] 565 A.2d 908 (Del. 1989).

they did not read. The Supreme Court rejected the notion that the insureds could avoid the arbitration clause in the policy simply by showing they did not know it was in there. According to the Supreme Court, acceptance of the insureds' argument would stand the law of contracts on its head. "If the [insureds'] argument were followed to its logical extreme, an insured could radically redefine his policy simply by proving that he had not been informed of its stated terms in advance of purchase."[35]

Two years after *Graham* the Supreme Court had occasion to specifically consider the effect of signing a contract without reading it. In *Pellaton v. Bank of New York*[36] an individual signed a promissory note on behalf of his company which contained a personal guarantee and confession of judgment on that guarantee. The individual sought to avoid that guarantee and confession of judgment, claiming that he relied upon his lawyers. The Supreme Court rejected his contention, reasoning that he was responsible for reading the documents and, if he signed them without reading them, he did so at his own peril. According to the *Pellaton* court:

> That … [Pellaton] did not read the … [loan documents], if such were the fact, was his own fault. It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law. A contractor must stand by the words of his contract; and, if he will not read what he signs, he alone is responsible for his omission.[37]

---

[35] *Id.* at 912 (footnote omitted).
[36] 592 A.2d 473 (Del. 1991).
[37] *Id.* at 477 (*quoting, Upton, Assignee v. Tribilcock,* 91 U.S. 45, 50 (1875) (citations and quotation marks omitted)).

It is undisputed that Mr. Tomazine explained the importance of making sure the applications were correct; Mrs. Mulrooney admitted she understood that importance and was aware that LSW could void her policy if anything on the application was incorrect; Mr. Tomazine did not pressure or rush the Mulrooneys and they had as much time as they wanted to review the applications before signing them. Nonetheless, Mrs. Mulrooney chose to merely "glance" at the application before signing it. Mrs. Mulrooney is therefore bound by the misrepresentation that she was 5 feet 8 inches tall, irrespective of whether Mr. Tomazine incorrectly transcribed what Mrs. Mulrooney told him.[38]

Not only does Mrs. Mulrooney's decision to sign the application bind her to the representations contained in that application, but also she is bound because of her duty of "utmost fairness" to the insurer. The local federal court, applying Delaware law, found that an applicant's failure to read and correct any mistakes on the application violated that duty and justified rescission of the insurance policy:

> For example, where plaintiff affixed his signature to documents memorializing his representations to Penn Mutual, and certified the information as true, complete, and accurate, plaintiff was charged with a duty to review those statements to which he subscribed and report any misrepresentations or omissions to Penn Mutual.[39]

Mrs. Mulrooney attempts to justify her failure to read the application before signing it because she had to leave to go to work. The same excuse for not

---

[38] *Oglesby*, 877 F.Supp. at 888 ("In view of plaintiff's unqualified written certification that he had read the incomplete answers before signing the document, that they were correctly written, true, and complete, the conclusion is inevitable that he did not act in utmost fairness when signing the factually deficient application.").
[39] *Id.*

reviewing an insurance application was rejected by the Court of Chancery in *American Casualty Co. of Reading, Pa. v. Ford*[40] wherein the court held:

> While there is some evidence of 'sales pressure' on the part of the agent selling the policy here in issue in that defendant signed the application while at his dining room table at a time when he was anxious to return to his job of running a service station, nonetheless I am satisfied that defendant is a man of normal intelligence and knew or should have known what he was signing.[41]

Even assuming Mrs. Mulrooney were justified in signing the application without reading it because she had to hurry off to work, she and her husband are still bound by the representation in the applications because they never notified LSW of the error after the policies were delivered to them. There is no dispute that shortly after the meeting in the Mulrooney house when they signed the applications Mr. Tomazine hand delivered copies of the policies to their home. There is also no dispute that copies of the applications were physically attached to the policy and expressly made part of the policy. As part of their duty to act with the "utmost fairness" to LSW, the Mulrooneys were obligated to read the policy and the attached applications to ensure that everything was correct.[42] "Even if [the insured] cannot be charged with the responsibility to read the entire insurance policy, he is held responsible for reading those portions, such as the application, which involve information he provided, and which were required to be

---

[40] 187 A.2d 425 (Del. Ch. 1963).

[41] *Id.* at 427.

[42] The policy provided that any statement the Mulrooneys made could not be used "to make the policy void," "[u]nless such statement is in the attached application."

truthful at the risk of voiding the policy."[43] The Court of Chancery explained this obligation in *Prudential Ins. Co. of America v. Ford*:[44]

> A cursory examination of the issued policy with its attached photostat of the application would have disclosed to him that the answers concerning medical history appearing on the application were the very basis for the issuance to him of a policy of insurance and that the answers 'filled in' by the agent were false. The policy clearly states that the insured's basic state of health, as disclosed in the application is material to the undertaking to be assumed by the insurer. So that if the actual application for insurance was solicited under pressure and without proper regard for the fiduciary duty owed by the agent to Mr. Ford, and such would seem to have been the case, **on receipt of the policy by Mr. Ford there would appear to have been an ample opportunity for him to read and understand it and a duty resting on him to bring material mistakes in the application form to the insurer's attention for such action as it saw fit to take** ….[45]

Mrs. Mulrooney admitted she never read the policy or the application form after it was delivered to them by Mr. Tomazine.[46]

### Conclusion

The court assumes that Mrs. Mulrooney told Mr. Tomazine she was between 5 feet 4 and 5 feet 5 when Mr. Tomazine was filling in the application in the Mulrooney living room. The court further assumes that Mr. Tomazine

---

[43]  *Oglesby*, 877 F.Supp. at 888.
[44]  144 A.2d 234 (Del.Ch. 1958).
[45]  *Id.* at 237.
[46]  The Mulrooneys also seem to suggest that LSW should have caught the mistake on its own, either by Mr. Tomazine's observations of Mrs. Mulrooney at the meeting or by the height stated on her driver's license which was handed to Mr. Tomazine (recall that that driver's license, which was then four months old, understated Mrs. Mulrooney's weight by 100 pounds.) Mrs. Mulrooney also stated she thought a para professional coming to her home to take blood samples for the insurance company would also correctly identify her height. None of this excuses her obligation to ensure that the facts stated on the application were correct. "Delaware courts have even taken this majority rule a step further, holding that even if an insurer should have researched the veracity of an applicant's representations, it has not waived the right to later assert and prevail on a claim for misrepresentation." *Oglesby*, 877 F.Supp. at 895.

incorrectly recorded her height as 5 feet 8 on the form. Nonetheless Mrs. Mulrooney is responsible for that misrepresentation. She understood the importance of the application being correct and understood that LSW could void the policy if the information was wrong. She was told to read the policy before signing it. She chose not to. To paraphrase the Court of Chancery:

> [Mrs. Mulrooney] is understandably unhappy that she did not read the [completed application]; however, she was presented with a fair opportunity to do so . . . and even [signed the application saying the statements were true to the best of her knowledge and belief]. She . . . appears to regret [doing so] now, but it was her choice to modify her rights without fully investigating the terms to which she agreed.[47]

**WHEREFORE,** LSW's motion for summary judgment on its application to rescind the agreement is **GRANTED.** Because Plaintiffs' claims for bad faith against LSW are predicated on the existence of a contract, LSW's motion for summary judgment dismissing those claims is **GRANTED.**

Date: September 3, 2014

_____
John A. Parkins, Jr.
Superior Court Judge

oc: Prothonotary

cc: Lisa C. McLaughlin Esquire, Wilmington, Delaware
John D. Demmy, Esquire, Wilmington, Delaware
Richard D. Abrams, Esquire, Wilmington, Delaware

---

[47] *Newell Rubbermaid Inc. v. Storm*, 2014 WL 1266827 (Del.Ch.).